## JOHN F. WAFER, *as Sheriff of Harvey County, et al.,* v. HARVEY COUNTY BANK *et al.*

1. FRAUD — *Chattel Mortgage, When no Lien.* An antecedent creditor, who knows that his debtor procured goods and merchandise by fraudulent means, cannot by a chattel mortgage secure a lien on such fraudulently-procured goods, adverse to the innocent vendors of such goods.

2. ANTECEDENT CREDITOR, *Who Has no Lien on Goods Procured by Fraud.* An antecedent creditor, who knows that his debtor has procured goods by fraudulent means, when the sale of such goods is partially

induced by the representations of such antecedent creditor as to the credit of his debtor, cannot by a chattel mortgage secure a lien on such fraudulently-procured goods, adverse to the innocent vendors of such goods.

3. EVIDENCE *to Show Fraudulent Intent.* The failure of a chattel mortgagee to have his mortgage recorded for 43 days, or to disclose its existence to other creditors, when the financial condition of the debtor is being discussed, and who promised the debtor that he would not disclose its existence to other creditors who were demanding payment or security for their claims, is strong evidence tending to show a fraudulent intent to hinder and delay creditors.

### *Error from Harvey District Court.*

ACTION brought on May 8, 1884, by the *Harvey County Bank* and *R. M. Spivey* against *John F. Wafer,* as sheriff of Harvey county, to recover the possession of a certain stock of goods. On May 19, following, and before answer to the petition, Wafer moved that the attaching creditors should be substituted as defendants in his stead, and the creditors also at the same time appeared and prayed to be substituted as defendants for Wafer. These several applications were denied on May 20. On the same day, each of the attaching creditors separately applied to be made a party defendant with Wafer. These applications were also refused. Afterward, Wafer filed an answer containing a general denial, and the case was tried before the court with a jury, and a verdict returned for the plaintiffs. On March 31, 1885, a new trial was denied and judgment rendered in favor of the bank and Spivey for a return of the goods, or the sum of $8,640, in case a return could not be had, together with all the costs. The defendant sheriff brought the case to this court, where the judgment of the district court was reversed, and the cause remanded for further proceedings. (*Wafer v. Harvey County Bank,* 36 Kas. 292, *et seq.*)

In due time certain attaching creditors were made parties defendant in the action, and the case was tried at the May term, 1888, and a verdict returned for the plaintiffs. On June 19, 1888, a new trial was denied the defendants, and judgment was rendered for the plaintiffs for $11,465. The de-

fendants have brought the case to this court.   The material
facts are stated at length in the opinion herein, filed June 6,
1891.

*J. D. Snoddy*, and *Green & Shaver*, for plaintiffs in error.

*J. W. Ady*, and *Bowman & Bucher*, for defendants in error.

Opinion by SIMPSON, C.: This is an action begun by the
Harvey County Bank and R. M. Spivey, as plaintiffs, against
John F. Wafer, who was then sheriff of Harvey county.
Wafer, as sheriff, had seized, under various orders of attach-
ment, a stock of goods belonging to the attachment debtor,
R. M. Hamill.   The bank and Spivey claimed to have the
right to the possession of the attached property by virtue of
a chattel mortgage thereon, executed by R. M. Hamill on
the 20th day of March, 1884.   The attaching creditors were
made parties, and filed answers alleging that the chattel mort-
gage was fraudulent and void as against them.   The case was
tried by a jury at the March term, 1883, of the district court
of Harvey county.   The jury returned a verdict for the bank,
and fixed the value of the goods at $21,896.17, and the value
of the plaintiff's right of possession at $12,095.03.   A mo-
tion for a new trial was overruled, and a judgment rendered
on the verdict.   The material facts disclosed at the trial are
these: For many years prior to the commencement of this
action the firm of Hamill Bros. had been engaged in merchan-
dising in the city of Newton, and was a firm of good credit
and of high repute.   As a matter of fact, on or before the
20th day of March, 1884, the firm, and especially D. Hamill,
the principal partner, was largely indebted, both as a member
of the firm and individually.   D. Hamill was the active and
controlling member of the firm, and his brother, R. M. Hamill,
appears up to a certain date to have been subordinate.   There
is evidence tending very strongly to show that in October,
1883, the firm was dissolved, a notice of dissolution was pub-
lished, and in the next issue of the paper after the publication
of the notice of dissolution the card of the business firm was
changed from Hamill Bros. to D. Hamill.   The terms of this

dissolution were such that D. Hamill assumed all the debts and liabilities of the firm, and alone had the right to collect all the claims and outstanding accounts of the old firm. In January, 1884, a contract was entered into between D. Hamill and R. M. Hamill that reads as follows:

"This Agreement Witnesses, That in consideration, and as a full, final settlement of the respective rights, claims, accounts and interests of D. Hamill and R. M. Hamill, recently partners as Hamill Bros., the said parties have agreed and do hereby agree upon the following: R. M. Hamill shall be solely liable for all goods purchased and put into the store situated upon the lot hereafter described, from and after the 1st day of January, 1884, and said D. Hamill shall in no event be liable in any way for any portion of such goods, and has no interest therein except as herein specifically provided; said R. M. Hamill may, for the purpose of establishing his own business interests, advertise said business as his own, and purchase and incorporate into said stock of goods such goods as he may desire upon his own individual credit. Said R. M. Hamill shall contribute his own efforts toward the carrying on of said business in the same way and under the same conditions and restrictions that he has been since the 1st day of January, 1884. Until all the debts owing by the former firm of Hamill Bros., as shown by the books of said firm, are fully paid, D. Hamill shall remain in charge of said business as financial manager thereof, applying the net proceeds of all sales to the liquidation of said debts of Hamill Bros. until the same are fully paid. All goods in said store, whether they are goods formerly owned by Hamill Bros., or such as have since been or may in the future be put in said store by R. M. Hamill, shall be subject to sale in the ordinary course of business, and the net proceeds of such sale to be applied in liquidation of the debts of said firm as above agreed upon. When all of said debts have been fully paid, as above indicated, then said R. M. Hamill shall be the absolute owner of all goods in the store, and said D. Hamill shall execute and deliver to him a bill of sale for all of his interest therein, and deliver to him the absolute and exclusive control of said business and all goods in said store. The store herein referred to is that kept in the building upon lot No. 8, in block No. 38, in the city of Newton, Harvey county, Kansas; and the said D. Hamill, being the owner of said lot and building, together with the fixtures and furniture in said store, agrees that when full con-

trol of said business is transferred to R. M. Hamill as above contemplated, he will execute to said R. M. Hamill a lease of said store and fixtures and furniture used therein, at the rate of $50 per month, payable monthly in advance from month to month, and said lease may be terminated by either party upon giving 60 days' notice to the other party. This lease shall include only the store-room, ware-room and cellar now used in the business, and free ingress and egress to and from the same over said lot.          D. HAMILL.
                                                     R. M. HAMILL."

At the time this contract was entered into, the firm of Hamill Bros. was indebted to various creditors in the sum of $4,800, and they owed the Harvey County Bank a note of $5,000. R. M. Spivey was then, and for a long time before had been, the vice-president and active manager of the Harvey County Bank, and was in the full charge of its business. Some time after the contract of January, 1884, was made, R. M. Hamill went to Chicago to buy goods with which to replenish the stock. He carried with him a letter from Spivey, as follows:

"HARVEY COUNTY BANK,
(Successor to the Harvey County Savings Bank.)

| O. B. SCHMIDT, *President.* | JULIUS SIMON, *Cashier.* | R. M. SPIVEY, *Vice-President.* |

NEWTON, KAS., February 29, 1884.

"*To whom it may Concern:* The bearer, R. M. Hamill, succeeds the firm of Hamill Bros., merchants of long standing in this city. Mr. R. M. Hamill is not indebted to this or any other bank, and with his long experience and general acquaintance in this country, believe he will do a good business, and with continued prosperity no doubt he will make prompt payment for any goods he may purchase.

      Respectfully,      R. M. SPIVEY, *Vice-President.*"

While R. M. Hamill was in Chicago, Spivey wrote the following letter to a wholesale firm there from which R. M. Hamill bought goods:

"HARVEY COUNTY BANK.

| O. B. SCHMIDT, *President.* | JULIUS SIMON, *Cashier.* | R. M. SPIVEY, *Vice-President.* |

NEWTON, KAS., March 8, 1884.

"*Kahn, Schoenbrun & Co., Chicago, Ill.:*

"GENTLEMEN—I had a telegram from R. M. Hamill yesterday, stating that Harvey County Bank reports him as ow-

ing $8,000. The statement which we sent you regarding his financial standing was intended to be confidential, but it seems you have not made the information confidential, but informed him the contents. Under the circumstances, I do not care to confide in you further statements, but will add that Mr. R. M. Hamill does not owe this bank but $200, and does not owe any bank, which I wired you last night.

Yours,        R. M. SPIVEY."

On the 1st day of March, 1884, D. Hamill wrote to Norton and Cahill, salesmen for two large wholesale houses, from whom R. M. Hamill bought goods, the following letter:

"MONARCH MILLS, D. HAMILL, Proprietor.

"NEWTON, KAS., March 1, 1884.

"*Messrs. L. R. Norton and J. H. Cahill, Chicago, Ill.:*

"GENTLEMEN — Robert M. has just handed me your letter to him of the 27th ult. So far as the report is concerned to which you refer, I wish to say that there is not a word of truth in it. As a matter of fact Robert does not owe a dollar. So far as my own liabilities are concerned, they are a *matter of record*, and concern none but me personally, and I am fully able to take care of them.

"Gentlemen, Robert could have bought his goods several times since arrangements were made with you, and was strongly urged to do so, but his preference has been to buy of you. I only ask that you sell him goods at the *right kind of prices*, so that he can *meet competition*.

"I wish also to say, gentlemen, that the First National Bank of this city and myself have been and are now on anything but friendly terms. This feeling was brought about from the fact that I did not patronize that bank, but did my business through the Harvey County Bank. The First National Bank has lost no opportunity to injure my business whenever they had the opportunity. So far I have been able to come out ahead in every encounter, and I think I can manage to take care of myself. I did not suppose that they would on that account endeavor to injure Robert's credit.

Very respectfully,        D. HAMILL."

The Harvey County Bank loaned R. M. Hamill $200 with which to pay his expenses on the Chicago trip. He bought on this trip from John V. Farwell & Co., Kahn, Schoenbrun & Co., and C. M. Henderson & Co., goods exceeding in value $18,000. He wrote to the wholesale houses on the 17th day

of March that the goods had all arrived safely at Newton. While at Chicago he made a sworn statement of his financial condition to J. V. Farwell & Co., that reads as follows:

"CHICAGO, ILL., March 4, 1884.

"I, R. M. Hamill, of Newton, county of ——, state of Kansas, for the purpose of obtaining a credit with John V. Farwell & Co., of Chicago, Ill., for goods which —— may now or hereafter purchase of them, do make the following statement and representations of —— present true financial circumstances, wealth, and mercantile respectibility, which said representations shall be the basis of —— credit with John V. Farwell & Co., both for —— present purchase, and for all purchases for and during the period of five years from this date, agreeing to immediately notify them of any material change in or of —— business matters during the the period above mentioned.

"—————— a copartnership of ——————.

| "ASSETS. | Amount. |
|---|---|
| Stock of goods on hand at value........................... | $12,555 00 |
| Notes and accounts, good................................ | ·2,000 00 |
| Notes and accounts, doubtful............................. | ........ |
| Notes and accounts, worthless............................ | ........ |
| Cash on hand or in bank................................. | ........ |
| Other personal property................................. | ........ |
| Insurance (will increase)................................ | 6,000 00 |
| Real estate in my name at market value, storehouse....... | 7,500 00 |
| References............................................. | ........ |

| "LIABILITIES. | Amount. |
|---|---|
| Incumbrances on real estate............................. | $2,500 00 |
| Incumbrances on personal property ...................... | ........ |
| For merchandise, not to exceed.......................... | 2,842 58 |
| For borrowed money .................................... | None. |
| Individual liabilities ................................... | None. |
| For confidential and all other liabilities.................. | None. |
| Amt. debts past due, included in merchandise indebtedness, | None. |

(Signature)　　R. M. HAMILL."

On the 18th day of February, the Harvey County Bank, by Spivey, made a commercial report on R. M. Hamill to the reporting agency of Bond & Weigley, that was furnished by them to Kahn, Schoenbrun & Co. It is as follows:

"Name in full of each member: Rob't M. Hamill.
Business: Dry goods, clothing, etc.

| | |
|---|---|
| Amount of capital in business........................... | $15,000 00 |
| Amount borrowed capital................................ | 8,000 00 |
| Value of real estate..................................... | 3,000 00 |
| Incumbrance........................................... | 1,700 00 |
| Value personal property................................ | 500 00 |
| Any chattel mtgs. or ................................... | None. |

| | |
|---|---|
| Other liens............................................... | None. |
| Value of stock.......................................... | None. |
| Married................................................. | Yes. |
| Character .............................................. | Good. |
| Attentive to business................................... | Yes. |
| Prompt pay............................................. | Fair. |
| Insured................................................. | Yes. |
| Credit largely......................................... | More or less. |
| Prospect of success.................................... | Fair. |
| Ever failed or asked extensions......................... | None. |
| Do you consider.....good for.....a credit of 1,000 dollars, | Yes. |

"REMARKS.

"R. M. Hamill will, in a month or so, succeed to the business of Hamill Bros. If country continues prosperous he will succeed.

"Yours,          HARVEY CO. BANK."

On the 20th day of March, 1884, the following agreement was made in writing between R. M. Hamill, D. Hamill, and R. M. Spivey:

"NEWTON, KAS., March 20, 1884.

"In consideration of D. Hamill releasing and assigning to R. M. Hamill all of his right, title and ownership in and to all of the goods (not including store furniture and fixtures) kept by Hamill Bros. and D. Hamill in their store upon lot 8, block 38, Newton, Kas., which he hereby does, we, the undersigned, R. M. Hamill and R. M. Spivey, agree and bind ourselves to pay and hold the said D. Hamill harmless of all the following debts now owing by the said Hamill Bros. to—

| | |
|---|---|
| R. L. McDonald.......................................... | $94 00 |
| Jno. V. Farwell......................................... | 1,600 00 |
| C. M. Henderson ........................................ | 400 00 |
| A. N. Shuster.......................................... | 650 00 |
| J. W. Bailey & Co....................................... | 200 00 |
| Noyes, Norman & Co...................................... | 144 00 |
| H. M. Price ............................................ | 250 00 |
| Tootle, Hosea & Co...................................... | 350 00 |
| Reynolds Bros........................................... | 300 00 |

I. Weil, four notes in bank.

"All debts of said firm to Harvey County Bank; all of which debts we assume; and R. M. Hamill agrees to pay any other debts of said old firm, should any be found not included in this agreement. Should D. Hamill be compelled to pay any debts in violation of this agreement, we agree to repay him all costs and expenses he may be put to on account thereof.

"Made in duplicate.                    R. M. HAMILL,

D. HAMILL,

R. M. SPIVEY."

On the same day R. M. Hamill executed a note for $10,000 to the Harvey County Bank, and a chattel mortgage to secure

the same.   The consideration of the mortgage is alleged to be
the note of D. Hamill to the bank for $5,000, the debts of
the firm guaranteed by Spivey, $4,800, and the $200 bor-
rowed by R. M. Hamill from the bank, with which to pay
the expenses of his Chicago trip.   This mortgage was kept
in the vaults of the bank and not recorded until the 3d day
of May, 1884, and not until the Chicago creditors had ap-
peared at Newton and demanded security for the payment of
their claims.   These are some of the material facts as they
appear in the record.

The jury returned answers to the following special inter-
rogatories:

"1.   At the time John F. Wafer, as sheriff, took the stock
of goods, how much was the Harvey County Bank entitled
to hold the same as security for?   Ans. $10,000.

"2.   What items of indebtedness made up the amount of
the $10,000 note secured by chattel mortgage?   State fully
the amount of each.   A.   One note of $5,000; guaranteed
claims to eastern creditors, $4,800; borrowed money, $200.

"3.   Was the stock of goods pledged to R. M. Spivey, and
if so, for what?   State specifically amount of each item.   A.
Pledge void.

"4.   Were the goods pledged to R. M. Spivey, among other
things, for future advances to be made to R. M. Hamill for
the support of himself and his family?   A.   Pledge void.

"5.   Did R. M. Hamill obtain the goods from the attach-
ing creditors by false and fraudulent means?   A.   Yes.

"6.   Did the Harvey County Bank, through its officers,
know that R. M. Hamill had purchased the goods by false
and fraudulent means at the time it took this $10,000 mort-
gage?   A.   No.

"7.   Did R. M. Spivey, by his letters of February 29, 1884,
and March 8, 1884, and his telegram of March 8, 1884, tend
to and partially induce the attaching creditors to give R. M.
Hamill credit and to sell him goods?   A.   Yes.

"8.   Did R. M. Spivey have knowledge, at the time he
accepted the pledge, that R. M. Hamill had purchased the
goods by false and fraudulent means?   A.   Pledge void; and
if time above refers to the pledge of May 3, 1884, we say
'Yes.'

"9.   At the time R. M. Spivey wrote his letters of credit of

February 29, 1884, and his letters and telegrams of March 8, 1884, did he not know that Hamill Bros. were largely indebted to Harvey County Bank and eastern creditors? A. Not as a legal firm, as the evidence proves that the firm was in reality dissolved October 3, 1883.

"10. At the time David Hamill wrote his letter of credit for R. M. Hamill, to Norton and Cahill, dated March 1, 1884, did he know that Hamill Bros. were indebted to the Harvey County Bank and eastern creditors? A. Not as a legal firm, as the evidence proves that the firm was really dissolved October 3, 1883.

"11. What persons composed the firm of Hamill Bros. during 1882, 1883, and 1884? A. D. Hamill and R. M. Hamill composed the firm of Hamill Bros. in 1882, and until the 3d of October, 1883."

I. It has been said that "every case must create its own law;" but this is one in which the fraud alleged is not purely a question of law, nor yet exclusively a question of fact, but the two are so closely interwoven, and so intimately blended together, that they both concur to produce the belief that a part of the truth was suppressed, and cunning artifice resorted to, and that both actual and constructive fraud was committed in the attempt to hinder and delay honest creditors receiving their just dues. These two important facts are established by the evidence and found by the jury: First, That R. M. Hamill procured the goods covered by the chattel mortgage to the bank from the attaching creditors by fraudulent misrepresentations; second, that R. M. Spivey, by his letters and telegrams, partially induced the attaching creditors to give R. M. Hamill credit and to sell him goods. There are some other important facts established by the evidence contained in this record. Spivey was the active and controlling officer of the Harvey County Bank, and he knew of the indebtedness of Hamill Bros. to the bank and to the other creditors. He had loaned R. M. Hamill the money to pay his expenses on the Chicago trip, and knew that Hamill went there to buy goods. A short time before this he had made a confidential report of the financial condition of R. M. Hamill to a mercantile agency in Chicago. He had every opportunity to know, and did

know, the exact financial condition of Hamill Bros., of D. Hamill, and of R. M. Hamill.

Again, as matters of law, the knowledge of Spivey as to the financial condition of the firm of Hamill Bros., and of the individual members of the firm, was the knowledge of the bank, whose managing officer he was. He knew as a matter of law that D. Hamill had an agreement with R. M. Hamill that he was to pay the outstanding debts of the firm, or that the goods on hand were pledged to their payment, and that R. M. Hamill, as a member of the firm, was still liable for their payment, notwithstanding his agreement in January with D. Hamill; and by reason of his knowledge the bank knew this. He knew that the creditors of the firm had never accepted the individual assumption of the debt of Hamill Bros., and that, at the time the credit was extended, had not released R. M. Hamill, and the bank had not done so. In a word, both Spivey and the Harvey County Bank knew all about the financial condition of the firm of Hamill Bros., and of the individual members composing it, at the time R. M. Hamill went to Chicago and procured these goods from the attaching creditors. All these things are apparent from this record. One of the questions arising on this state of facts is this: Can an antecedent creditor, who knows that his debtor has procured goods and merchandise by fraudulent means, take a chattel mortgage on goods thus procured, and acquire a lien adverse to the interest of the vendors? Another question is: Can an antecedent creditor of a debtor who procures goods fraudulently from wholesale merchants, who were partially induced to give such debtor credit on the strength of letters of the antecedent creditor, acquire by chattel mortgage a lien of the goods so procured adverse to the interests of the wholesale merchants? Another question is: Can one who knows that goods and merchandise are procured by fraudulent means acquire any interest in or lien on such goods against the innocent vendors?

II. The legal principle applicable to the first fact is, that these goods having been obtained from the attaching creditors

by fraudulent means by R. M. Hamill, he acquired no title or right of possession in them, and the attaching creditors would be justified in retaking the goods; or they could waive the tort and bring an action to recover their value; or an action to recover damages for the deceit. (Story, Sales [4th ed.], §172a; Newmark, Sales, §360, note; *Lyons v. Briggs*, 14 R. I. 222; *Savings Bank v. Barge Co.*, 52 Mich. 164; *Cain v. Dickenson*, 60 N. H. 371; *Deickerhoff v. Brown*, 21 Md. 583; *Newell v. Randall*, 32 Minn. 171; *Fitzsimmons v. Joslin*, 21 Vt. 129.) They elected, in this case, to waive the tort and bring an action to recover the value of the goods.

The law applicable to the second fact is, that where the fraud consists in inducing, by false representation, a sale of goods to an insolvent third person, from whom the misrepresenting party afterward obtains them, the seller may bring suit for the price against the latter party as though he had bought the goods in his own name. (*Biddle v. Levy*, 1 Starkie, 20; *Hill v. Perrott*, 3 Taunt. 274; *Phelan v. Crosby*, 2 Gill, [Md.] 462; *Thompson v. Davenport*, 2 Smith, Lead. Cas. 407; *Meyer v. Amidon*, 23 Hun, 553; Benj., Sales [4th ed.], §491; 2 Schouler, Pers. Prop. [2d ed.], §672.) The particular act of Spivey that was evidently in the minds of the jury, that produced the special finding, was that his letter and telegram in which he asserted that R. M. Hamill did not owe the Harvey County Bank but $200, when in fact and in law he was indebted to the bank in a large sum, partially induced the sale of goods to Hamill by the Chicago merchants. This representation, known at the time it was made by Spivey to be untrue, is fraudulent. Chief Justice Marshall, in *Russell v. Clark's Ex'rs*, 7 Cranch, 69, said:

"The ground of the action," said the court in *Boyd's Ex'rs v. Browne*, 6 Barr, 310, 316, "is the deceit practiced upon the injured party; and this may be either by the positive statement of a falsehood, or the suppression of material facts, which the inquiring party is entitled to know. The question always is, did the defendant knowingly falsify, or willfully suppress the truth, with the view of giving the third party a credit to which he was not entitled? It is not necessary that

there should be collusion between the party falsely recom-
mending, and him who is recommended; nor is it essential, in
support of the action, that either of them intended to cheat
and defraud the trusting party at the time.  It is enough if
such has been the effect of the falsehood relied on."

In the case of *Allen v. Addington*, 7 Wend. 10, reviewed in
the court of errors, 11 Wend. 375, the letter of the defendant
was written to a third person, and never shown to the plain-
tiff, but the plaintiff gave credit in consequence of what the
third person was induced by the letter to say.  The design of
the defendant was to have the goods sold to the party recom-
mended, from which he, as a creditor, might satisfy his own
debt; and the fraud was held to consist mainly in the sup-
pression of the fact that he held judgments against the person
recommended, which the latter was unable to satisfy.  The
court says it was a case of outrageous fraud and conspiracy.
This is an exhaustive and elaborate case.

In the case of *Patten v. Gurney*, 17 Mass. 182, the action
was brought by the plaintiffs against the defendants for
fraudulently affirming another to be trustworthy, in order
that they might levy on the goods with which he was trusted,
in satisfaction of debts owing by him to themselves.  Parker,
C. J., says:

"A false and fraudulent affirmation, relative to the credit
and ability of a person, to a merchant, who is thereby induced
to trust such person with goods, is a sufficient ground for ac-
tion, although there may have been no dishonest purpose of
appropriating the goods to the use of the party making the
recommendation, or in any way deriving a benefit from the
fraud."

See other cases cited in the American notes to the case of
*Palsey v. Freeman*, 2 Smith, Lead. Cas. (6th ed.), 166.

III.  Spivey knew that the goods had been procured from
the wholesale merchants at Chicago by fraudulent represen-
tations.  He knew that, at the time R. M. Hamill went to
Chicago to buy the goods, Hamill had no money, because
Spivey loaned him the money necessary to the expenses of
the trip.  He knew that, under the agreement between R. M.

39 — 46 KAS.

and D. Hamill, the stock on hand was pledged to the payment of the then outstanding indebtedness of the firm. He knew that the store-room and fixtures were the individual property of D. Hamill. He knew that the firm of Hamill Bros. was indebted to the Harvey County Bank in a sum in excess of $5,000. He knew that, since the agreement in January, R. M. Hamill had contracted debts for which he alone was responsible under that agreement, and which the firm was responsible for, unless the merchants from whom the goods were bought had knowledge of that agreement. The knowledge of all these facts, many of them fastened by his own admissions upon the witness stand, leads to the inevitable conclusion that he must have known that the goods were obtained fraudulently, and that the fraud was aided and abetted by Spivey's suppression of all these facts. A failure to disclose a material fact is equivalent to active misrepresentation, for the withholding of that which is suppressed may make that which is stated absolutely false. (*Devoe v. Brandt*, 53 N. Y. 462; *Brown v. Montgomery*, 20 id. 287; *Hanson v. Edgerly*, 29 N. H. 343; *Armstrong v. Huffstutler*, 19 Ala. 51; *Stephens v. Orman*, 14 Fla. 21; *Marsh v. Webber*, 13 Minn. 109; *Pease v. McClelland*, 2 Bond [U. S.], 42.)

The protection of a *bona fide* purchaser from a fraudulent vendee is almost universally recognized by the courts of this country, on the ground that the fraudulent purchaser has a voidable or defeasible title which, before its annulment by the vendor, the defrauding purchaser can transmit to a *bona fide* purchaser who is without knowledge or notice of the fraud, and because he has parted with value. One who buys with notice or knowledge of the fraud of his vendor in obtaining the property is not a *bona fide* purchaser, and is liable not only to lose the goods, but, if he sells, to pay their value. (*Stearns v. Gage*, 79 N. Y. 102; *Rateau v. Bernard*, 3 Blatchf. 244.) To constitute good faith there must be an absence not alone of participation in the fraud or collusion with the vendee, but also of knowledge or even notice of the fraud, or of facts and circumstances calculated to put an ordinarily

prudent business man on inquiry so that he would ascertain the truth. (Grant, Fraud. Vend. 568; *Lynch v. Beecher*, 38 Conn. 490; *Allison v. Matthieu*, 3 Johns. 235; *Stearns v. Gage*, 79 N. Y. 102; *Dows v. Kidder*, 84 id. 121; *Cochran v. Stewart*, 21 Minn. 435.) And it has been frequently held that the burden of proof to show good faith and purchase for value, as against the defrauded seller, is upon the party claiming to be a *bona fide* purchaser. (*Devoe v. Brandt*, 53 N. Y. 462; *McLeod v. National Bank*, 42 Miss. 99; *Lynch v. Beecher*, 38 Conn. 490; Schouler, Pers. Prop., 2d ed., § 609; *Jones v. Franks*, 33 Kas. 497; *Wygal v. Bigelow*, 42 id. 477.) Fraudulent intent is shown by turning the property over to another creditor very soon after it has been received. (1 Benj. Sales, p. 577, § 656, note 18; *Wiggin v. Day*, 9 Gray, 97; *Jordan v. Osgood*, 109 Mass. 462; *Parker v. Byrnes*, 1 Low. 539; *Davis v. McWhirter*, 8 Up. Can. Q. B. 598; 2 Kent, Comm. 484.) A sale is void where a creditor pays a debtor a surplus in purchasing his stock of goods with knowledge of fraud of vendor. (*Davis v. McCarthy*, 40 Kas. 18.) Where a merchant makes a sale to defraud his creditors, the purchaser is only protected as to the extent of the payments made in good faith without notice. (*Bush v. Collins*, 35 Kas. 535; *Burke v. Johnson*, 37 id. 337; *Moxley v. Haskin*, 39 id. 654; *Green v. Green*, 41 id. 474.) The intent to defraud is shown by acts and declarations. If a party is guilty of an act which defrauds another, his declaration that his intentions were honest cannot be taken as sufficient to overthrow the act. (*Babcock v. Eckler*, 24 N. Y. 623.) Where the fraud as to the creditors is participated in by both parties thereto, a chattel mortgage is void *in toto*. (*Winstead v. Hulme*, 32 Kas. 568; *Wallach v. Wylie*, 28 id. 138; *Marbourg v. Mfg. Co.*, 32 id. 636; *Hughes v. Shull*, 33 id. 127; *Bush v. Bush*, 33 id. 567; *Miller v. Krueger*, 36 id. 345.)

IV. The chattel mortgage executed by R. M. Hamill to the Harvey County Bank on the 20th day of March was not placed on record until the 3d day of May, and not then until

after conversations had by an agent of the attaching creditors with both Hamill and Spivey, in which conversations the existence of the chattel mortgage was not disclosed by either of them, and this was done in pursuance of an agreement made between them, and this agreement was made at a time when an agent of the attaching creditors was there urging payment or security by R. M. Hamill. The fact that the chattel mortgage was not recorded until the 3d day of May, and that there was an agreement by Spivey and R. M. Hamill not to disclose its existence to other creditors, taken in connection with all the other facts and circumstances disclosed by this record, is to be regarded as tending very strongly to show the fraudulent intent of these parties. (*National Bank v. Jaffray,* 41 Kas. 691.)

V. The court charged the jury in effect that the knowledge of Spivey was the knowledge of the bank, but the jury in their sixth special finding either did not understand or deliberately evaded such instruction. They find that the Harvey County Bank, through its officers, did not know that R. M. Hamill had purchased the goods by false and fraudulent means at the time it took this $10,000 mortgage. It was known to Spivey, and he was the active manager of the bank, and had been for some years prior to this time. If the jury meant that Spivey had no knowledge, there is not a particle of evidence to sustain this finding, as we view the facts. If they overlooked or gave no meaning to the words as used in the instructions of the trial judge, "If the bank, through its officers, knew," and supposed that the bank itself, as distinguished from its officers, did not know, then they misapplied the law. The other two findings, already largely discussed, are inconsistent with and antagonistic to the general verdict. In the 4th special finding the jury evaded an answer to a question of fact, and gave a legal conclusion. In the 9th and 10th special findings the evasion of the jury to a plain question of fact is self-evident. At the time the verdict was returned into court the plaintiffs in error demanded that the

jury be required to answer interrogatories Nos. 4, 9 and 10 more fully and specifically, which demand was refused by the court, and the jury was discharged. We think this was error.

We are satisfied that justice has not been done; that material error was committed in the trial; and that strong evidences of fraud and fraudulent intent are abundant in the record, and hence recommend that the judgment be reversed, and a new trial ordered.

By the Court: It is so ordered.

All the Justices concurring.