No. 31,190.

E. P. STANLEY, Administrator of the Estate of Julia Martin, Deceased, *Appellee,* v. ANNA F. MARTIN, *Appellant.*

No. 31,191.

E. P. STANLEY, Administrator of the Estate of Julia Martin, Deceased, *Appellee,* v. JULIA FLORENCE MARTIN, *Appellant.*

(22 P. 2d 951.)

Opinion filed June 10, 1933.

*W. H. Carpenter* and *W. R. Carpenter,* both of Marion, for the appellants.
*Z. C. Millikin,* of Salina, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: These two actions, consolidated for trial, were brought to set aside deeds to certain lands and city property which a mother had conveyed to her daughters some six years before her death and which were not recorded during the mother's lifetime.

The motive which prompted the actions was to uncover enough property in the mother's otherwise insolvent estate to satisfy the debt of one of her sons, for which she had been accepted as co-obligor on her repeated representations that she owned these properties and was collecting the rents therefrom.

Among the least controverted and pertinent facts of present concern were these:

In 1910 Thomas Martin, of Saline county, died intestate seized of 1,037 acres of land. He was survived by his widow, Julia Martin, and by seven sons and four daughters, some of whom were then under age. As the years went by deeds passed between these children and their mother, so that eventually she became sole owner of 640 acres of the lands of her deceased husband. At various times Julia mortgaged these lands, presumably to raise money to buy the interests of some of her children, and possibly to buy or build the residence in Salina in which she made her home for the last ten years preceding her death, which occurred in June, 1930.

In August, 1924, Julia made a deed to her daughter, Anna F. Martin, defendant in case No. 31,190, conveying 320 acres of land, valued by witnesses at $17,600 to $20,800, but subject to mortgages amounting to $7,000. The stated consideration was "one dollar, love and affection." Anna, the grantee, who was then about 33 years of age, was an office woman and employed at intervals in Wilson, Salina and Kansas City. At the same time Julia made a deed to her daughter, Julia Florence Martin, defendant in case No. 31,191, conveying a quarter section and two eighty-acre tracts of land, and the city residence in Salina, valued by witnesses at $18,800 to $21,-700, but subject to mortgages aggregating $10,050. The stated consideration was "one dollar, love and affection." Julia Florence, the grantee, was then 25 years of age. She lived with her mother and was employed in a business house in Salina.

These deeds were kept off the record until five days after the mother's death.

During the interval between the execution of the deeds in 1924 until their recording on July 5, 1930, there was no apparent change in the dominion and control the mother had theretofore exercised over the properties. From time to time thereafter some of the mortgages covering these properties had to be renewed or substituted, and these the mother executed; representing herself as sole owner.

For a number of years she had repeatedly joined one of her sons in the execution of a note to the Farmers National Bank of Salina for borrowed money, and on its periodical renewals she made written and oral statements to the bank as a basis for such credit. Typical of these was one dated and signed by her on December 10, 1928, in which she listed her real estate (the 640 acres and the town residence involved in these actions) and answered questions thus:

"In whose name is title to above real estate recorded? Mine.
"Is real estate held in fee simple or leasehold? Fee simple."

On another occasion, about 1926, she similarly listed her assets and liabilities to the same bank, in part thus:

"Assets.

| | |
|---|---:|
| "Bills (notes) receivable (all good) | $3,369 |
| Growing crops: | |
| ⅓ int. in 140 acres of wheat | 420 |
| ⅓ int. in 40 acres oats and barley | 120 |
| Household goods | 500 |
| 640 acres in Saline county at | 45,000 |
| House and lot in Salina, Kansas | 8,000 |
| Total assets | $57,409 |

"Liabilities.

| | |
|---|---:|
| Borrowed money | $3,821 |
| Notes indorsed for friends | 1,072 |
| Encumbrances on real estate | 16,500 |
| Total liabilities | $21,393 |
| Net worth | 36,016 |
| Total | $57,409" |

Just what disposition was made of the deeds of 1924 to these defendants after their execution was one of the controverted questions of this lawsuit. Plaintiff had alternative theories, one that the deeds

were never delivered by the grantor to the grantee during her life time, and the other theory that they were executed as a part of a scheme to defraud the creditors of Julia. Incidental to the latter theory was plaintiff's contention that whether so intended or not, the conduct of the parties concerned in respect to the deeds operated to defraud the creditors of Julia who had extended credit to her on the faith of her representations (and of the record titles) that she did own the properties.

The notary who took the acknowledgment of the two deeds also served as scrivener. He testified that he supposed he handed them back to the grantor. The defendant, Julia Florence Martin, testified that her mother had a safety-deposit box in the Farmers National Bank in Salina to which she had access; that the deeds were kept in it until November, 1926, at which time she took out the one drawn in her favor and put it in the safe of her employer, the Salina Plumbing Company. She also testified that in 1928 she (defendant) gave the deed drawn in favor of her sister Anna to her and she took it to Kansas City.

There was, however, some testimony that the mother had informed certain members of the family about these conveyances to the defendants. A neighbor, Ryan, also testified that he had heard her tell his mother that "the McAuliffe place" belonged to Anna.

"I could not give her exact words. I can give a kind of idea. Miss Anna Martin was present and she was working in Kansas City and Mrs. Martin was kind of teasing Anna about going back to Kansas City, said she ought to get a job and work here. She said if she cannot get a job she can move up here on her farm. She owns the McAuliffe place now, that is as near as I can recall the words. She said she owned it now, that is what she told me. I thought of this conversation some time last winter or last spring when one of the boys brought up the conversation. She did not say anything about the south half of section 7 [the land conveyed to Anna] that I recall, and I did not ask her anything about it."

There was testimony which went into much detail touching various conveyances which passed between mother and children, whereby some of the latter obtained title to independent interests in the lands of Thomas, and showing how Julia, the mother, obtained the entire fee of the lands involved in these actions.

The trial court held that both deeds were invalid and ineffectual as against plaintiff and the creditors of the estate of Julia Martin, deceased, and judgment was entered accordingly.

Defendants appeal, urging certain errors:

1. The authority of plaintiff to bring the action was challenged below and is still challenged because when he was appointed administrator he did not give the statutory bond. It is not clear that this fact was squarely brought into the record below. Counsel for appellant stoutly assert that it was. Counsel for the appellee cite us to the transcript which shows that the files of the probate court which *would show* that fact were merely identified but never introduced. The transcript reads:

[Counsel for Defendants]: "Your honor please, we are objecting to the consideration or the introduction of the evidence as a whole for the purpose of establishing and the right to maintain this suit. I am referring to the papers of the case of Stanley, administrator of the estate of Julia Martin, deceased.

[Counsel for Plaintiff]: "Yes, but the pleadings admit the appointment, and that is the due appointment of the administrator.

"The Court: That was admitted in the answer.

[Counsel for Plaintiff]: "It is alleged and not denied under oath.

[Counsel for Defendants]: "We don't have to deny it when the papers they introduce show he had no right to act. They have introduced those papers, which is the journal entry and they show, and we have a right to raise that under the face of the papers.

[Counsel for Plaintiff]: "I merely identified the papers. They weren't introduced.

[Counsel for Defendants]: "They were all introduced.

"The Court: The record doesn't show they were introduced at all."

Probably this excerpt from the transcript is sufficient to dispose of this point; but it can be quite as effectively dealt with if we assume that the matter is regularly within the record. The order of the probate court, in part, read:

"In the Probate Court of Saline County, Kansas. In the Matter of the Estate of Julia Martin, Deceased.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"It is therefore by the court ordered that the said E. P. Stanley be and he is hereby appointed administrator of the estate of Julia Martin, deceased, and it appearing to the court that there are no cash assets or personal property in said estate, the said E. P. Stanley is not required to give bond until further orders of the court, but that he shall take his oath of office as required by law."

This order was not subject to collateral attack. It is not like a case where the probate court lacks jurisdiction, as where the deceased intestate was not a resident of the county. A probate court— any court—does not deprive itself of jurisdiction by merely making an erroneous order. Assuming that so much of this order as attempted to excuse the named administrator from giving bond was erroneous, the proper way to set aside or correct such irregularity

was by motion or other pertinent challenge in the probate court. Failing there, an appeal could be taken; but such appointment was quite invulnerable to collateral attack. (*Ewing v. Mallison*, 65 Kan. 484, 70 Pac. 369, syl. ¶ 1; *Ekblad, Adm'r, v. Hanson*, 85 Kan. 541, 543-545, 117 Pac. 1028; *Beresford v. Am. Coal Co.*, 124 Ia. 34, 70 L. R. A. 256; 23 C. J. 1077.) In 11 R. C. L. 57, 58, it is said:

"In most jurisdictions the failure of a person appointed administrator to give a bond does not render the letters of administration void. They are, for such reason, only irregular and voidable, and therefore are not subject to collateral attack, but merely give ground for an appeal. Hence the general rule is that a defect in the bond of an administrator does not vitiate his appointment nor invalidate his acts, and the omission of a surety from an administrator's bond does not make void the grant of letters."

2. Error is also assigned on the admission in evidence of oral and written statements of Julia Martin made long after the execution of the deeds in controversy. One objection urged against this evidence is that defendants were not bound by the declarations of their mother after the *execution* of these deeds. If by "execution" appellants mean signature and delivery (as in I Bouv. 3d rev., 1112) this contention begs the question of delivery, which was a controverted matter in this lawsuit. The evidence concerning the mother's oral and written statements was competent on the question whether in fact the deeds had been delivered by her to her daughters in her lifetime. This evidence was also competent on the question of fraud involved in the mother's procurement of credit upon the representations that she owned the properties. (*Lumber Co. v. Cox*, 94 Kan. 563, 147 Pac. 67.) There was no request that the probative significance of this evidence should be limited. (*Sherman Co. Bank v. McDonald*, 57 Kan. 358, 46 Pac. 703.) But even assuming that the mother made an unqualified delivery of the deeds to her defendant daughters, their withholding of them from record until after the mother's death, their silence while she was executing new or renewal mortgages on these properties, or on some of them, which mortgages were recorded with the legal consequence that defendants had constructive notice of the mother's continued assertion of title and exercise of dominion over the properties—these considerations tended strongly to establish defendants' passive assent to the fraud, whether designed or not, thus perpetrated on the mother's creditors. These deeds, if effective from their dates in 1924, stripped the mother of virtually all her considerable property, leaving her nothing on

which to live and pay her debts except a nominal amount of personalty and a small government pension.

In the early case of *Hildreth v. Sands,* 2 Johns. Ch. 35, 47, Chancellor Kent referred approvingly to an old English case in which it had been held that a deed not at first fraudulent may become so by being concealed so that creditors are thereby deluded into lending their money.

Our own cases hold that an intent to defraud is not essential to the establishment of a cause of action attacking a conveyance which places property beyond the reach of creditors. (*Hardware Co. v. Semke,* 105 Kan. 628, 185 Pac. 732; *Jennings & Sons Tire & Accessory Co. v. Farmer,* 127 Kan. 164, 272 Pac. 167.) In *Morehead v. Martin,* 123 Kan. 612, 256 Pac. 995, the action was to restrain the sheriff from selling a quarter section of land which Martin's judgment debtor had conveyed to her sister. The deed was kept off the record for four years. In affirming a judgment denying the relief sought, this court said:

"The circumstances of the execution of the deed—its being kept off the record, the want of any disclosed exercise of dominion over the property by plaintiff such as is usual in *bona fide* ownership, the want of any binding consideration for the conveyance—these and other incidental circumstances tended persuasively to convince the trial court that the conveyance was not genuine or indefeasible so far as concerned Mrs. Peintner's judgment creditors. The court discerns no error in this case so far as the judgment rests on this conclusion of fact." (p. 614.)

See, also, *Wafer v. Harvey County Bank,* 46 Kan. 597, 26 Pac. 1032; Bump on Fraudulent Conveyances, 4th ed., § 52 and citations; Glenn on Creditors' Rights and Remedies, §§ 215, 216, and citations.

Counsel for defendants urge us to examine with care the annotation on the admissibility of statements derogatory to title after a grantor has parted therewith, in 1 A. L. R. 1240. This we have done, and also in Anno., Fraud on Creditors, Vendor's Declarations, 64 A. L. R. 797-830; and in Anno., Fraudulent Conveyances, Voluntary, 17 A. L. R. 728-743; and we must hold that the mother's declarations were competent on the theory of constructive or mutual fraud on creditors which flowed from the active and passive conduct of grantor and grantees in the circumstances narrated above. Those statements were also competent on the theory that the deeds were not delivered in the mother's lifetime. That there was some evidence of delivery is immaterial, as the trial court may not have be-

lieved it. Counsel refrained from asking the trial court for a specific finding on that highly important issue of fact.

3. Error is also urged on the overruling of the demurrer to the evidence. We fail to discern any error in such ruling. Counsel cite evidence which might have justified a different result from the one arrived at, if the trial court had given it generous credence. But that is of no consequence in this appeal. (*Peoples National Bank v. Diven,* 135 Kan. 400, 10 P. 2d 883.) It is suggested that there was no evidence to show that Julia had made any property statement when she first joined her son on his obligation to the bank in 1922 prior to the making of deeds in 1924. But that obligation was renewed from time to time, long after the deeds of 1924 were made or executed; and the inference is clear that Julia's property statements were made to advise the bank whether it would be prudent to renew the loan to her son with herself as coöbligor. Touching the matter of the burden of proof resting on plaintiff to show non-delivery, we think plaintiff did sustain it, or at least the trial ·court was justified in that view. Moreover, it was fairer to defendants for the trial court to hold that the deeds were invalid as to creditors of Julia only. The court did not find it necessary to rule absolutely that there had not been delivery. That result is a point upon which defendants may felicitate themselves. It certainly leaves them nothing to complain about.

As part of the argument of counsel against the ruling on the demurrer, it is also argued that the fraud alleged was not proved. We cannot assent to that contention, but it is needless to repeat the facts and circumstances which constituted or resulted in the fraud. Another point is essayed, based on the want of evidence to show that Julia's son could not pay his own debt to the bank. Julia, however, was more than a mere surety; she was a comaker with her son of the note which was the basis of the bank's claim against her estate.

The other objections to the judgments in these cases have been duly considered, but we must hold them unavailing and calling for no further discussion.

Both judgments are affirmed.