### MOORE v. SAWYER et al.

(Circuit Court, E. D. Oklahoma. January 5, 1909.)

**1. INFANTS (§ 99*)—AVOIDANCE OF CONTRACTS BY INFANTS—BURDEN OF PROOF.**

A party who pleads infancy as a ground for avoidance of a contract or instrument has the burden of proof to establish it by clear evidence; the presumption being in favor of the competency of parties.

[Ed. Note.—For other cases, see Infants, Cent. Dig. § 294; Dec. Dig. § 99.*]

**2. INDIANS (§ 16*)—LEASE OF OIL LANDS—FRAUD—ADEQUACY OF CONSIDERATION.**

An oil lease given by an allottee of the Creek Indian nation *held* valid, although at the time it was executed the lessor was confined in the penitentiary and had never seen the land, and was not aware nor informed of the fact that valuable oil wells had been drilled within two miles of the property; it appearing that the terms of the lease were not inequitable nor the consideration inadequate as compared with other leases on land in the vicinity made at about the same time, and in view of the approval of the lease by the Secretary of the Interior upon the report of agents who visited and examined the land.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

**3. MINES AND MINERALS (§ 55*)—OIL AND GAS LEASE—CONSTRUCTION OF INSTRUMENT.**

An instrument in terms granting all the oil, gas, coal, and asphaltum under certain described land, but which was denominated a lease, had a definite term of 15 years, and provided, in addition to a cash payment of $50, for the payment of a royalty on all oil produced, *held* not a conveyance in fee of the mineral in place, but merely a lease.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 160; Dec. Dig. § 55.*]

**4. INDIANS (§ 16*)—LANDS—POWER OF ALIENATION—LEASE.**

The supplemental agreement with the Creek Tribe of Indians, ratified by the Indians June 30, 1902 (Act June 30, 1902, c. 1323, 32 Stat. 500), provides in section 16 that "lands allotted to citizens shall in any manner whatever * * * be alienated by the allottee or his heirs" before the expiration of a certain time, except with the approval of the Secretary of the Interior. Section 17 provides that allottees may lease or rent their allotments under certain terms and conditions. *Held*, that the restriction against alienation applied to renting or leasing, and that the provision of Act April 21, 1904, c. 1402, 33 Stat. 204, that "all restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, thereby removed," removed all restrictions as to leasing by allottees within its scope.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

**5. MINES AND MINERALS (§ 74*)—OIL LEASES—RIGHTS OF BONA FIDE ASSIGNEE.**

Any equities in favor of a lessor in an oil lease arising out of suppression of facts when the lease was made or failure to pay a bonus provided for therein, and the receipt of which was acknowledged, does

---

not affect the validity of the lease in the hands of assignees who took it for value in good faith and without any knowledge of such facts.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 202; Dec. Dig. § 74.*]

6. INDIANS (§ 15*)—LANDS—ALIENATION—FRAUD AND INADEQUACY OF CONSIDERATION.

Complainant, who was an allottee of land in Indian Territory, was confined in the penitentiary in Kansas at the time the allotment was made, and had never seen the land. At a time when valuable oil wells had been drilled within a mile and a half of the land and there was considerable excitement in the locality, defendant, who was interested in a company which was about to drill on adjoining land, purchased 80 acres from complainant for $1,150. Complainant was not informed of the oil development, but, on the contrary, was told by defendant's agent, who was also at the time acting for him in an effort to secure a pardon, and who had seen the land, that $800 was a fair valuation therefor. *Held* that, in view of the situation of complainant, the suppression of facts and positive misinformation as to the value of the land, and the inadequacy of the price paid, the deed should be canceled for fraud on repayment by complainant of the price paid with interest.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 38; Dec. Dig. § 15.*]

7. DEEDS (§ 70*)—FRAUD—CANCELLATION.

A complainant *held* entitled to the cancellation for fraud of a quitclaim deed to land worth $25,000 which he was induced to execute for a consideration of $120 by misrepresentation and in the belief that it was an entirely different instrument.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 165, 173; Dec. Dig. § 70.*]

8. VENDOR AND PURCHASER (§ 235*)—BONA FIDE PURCHASER—CONSIDERATION.

A defendant purchased a tract of land worth $25,000, and with the value of which he was acquainted, for $1,200, receiving a warranty deed therefor. He made no inquiry as to the grantor's title, which was in fact through a quitclaim deed obtained by him by fraud and for a recited consideration of $120. *Held,* that defendant was charged with notice of the facts which a reasonable inquiry would have disclosed, and was not a bona fide purchaser, but took subject to the equities of the original grantor.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 572; Dec. Dig. § 235.*]

9. MINES AND MINERALS (§ 74*)—OIL LEASES—PRIORITY BETWEEN DIFFERENT LESSEES.

An assignee of a second oil lease on Indian land, who took the assignment of the lease with knowledge that a prior lease was outstanding, in reliance on the records of the office of the Indian agent, which showed that the prior lease had been forwarded to the Land Department for cancellation at the request of the parties, *held* not a bona fide purchaser entitled to preference over the prior lessee, where such prior lease was not in fact canceled but was approved by the Secretary of the Interior, the request for cancellation having been through a mistake, which fact would have been disclosed to the assignee of the second lease if he had made inquiry of the parties.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 202; Dec. Dig. § 74.*]

In Equity. On final hearing.

Bailey & Kistler, Barry Miller, and T. L. Camp, for complainant. Zevely, Givens & Smith, O'Hare & McCain, Harkless, Crysler &

Histed, Hutchings, Murphey & German, Wrightsman, Diggs & Bush, A. L. Beaty, Carroll & Walker, and Kenneth S. Murchison, for respondents.

CAMPBELL, District Judge. The complainant, Zeke Moore, is a member of the Creek Tribe or Nation of Indians. He is a negro, having no Indian blood, but by virtue of his enrollment as a citizen of said nation was entitled to and had allotted to him, prior to the dates of the various transactions involved in this controversy, 160 acres of the lands of the Creek Nation. At the time of such allotment, and at the times the various alleged deeds and leases, hereinafter mentioned were executed, he was confined in the United States penitentiary at Leavenworth, Kan., serving a sentence for the crime of larceny, imposed pursuant to a conviction in the United States Court for the Western District of Indian Territory. The land in question is located in what is now known as the "Glenn Pool District," which first began to attract attention as an oil field in 1905 or the early part of 1906, and has since developed into one of the richest fields in the state of Oklahoma.

By an act of Congress, entitled "An act to ratify and confirm a supplemental agreement with the Creek Tribe of Indians, and for other purposes" (Act June 30, 1902, c. 1323, §§ 16, 17, 32 Stat. 503, 504), it was provided:

"Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain non-taxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear. * * *

"Section 37 of the agreement ratified by said act of March 1, 1901, is amended, and as so amended is re-enacted to read as follows:

" 'Creek citizens may rent their allotments, for strictly nonmineral purposes, for a term not to exceed one year for grazing purposes only and for a period not to exceed five years for agricultural purposes, but without any stipulation or obligation to renew the same. Such leases for a period longer than one year for grazing purposes and for a period longer than five years for agricultural purposes, and leases for mineral purposes may also be made with the approval of the Secretary of the Interior, and not otherwise. Any agreement or lease of any kind or character violative of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its invalidity.' "

This agreement was ratified by the Creek Council on July 26, 1902. The President's proclamation was issued August 8, 1902. It will therefore be seen that the five-year restriction period imposed by the statute did not expire until July 26, or August 8, 1907, accordingly as the approval of the agreement provided for in the acts shall be considered as of the date of the ratification of the agreement by the Creek Council or the date of the President's proclamation.

By the Indian appropriation act, approved April 21, 1904 (Act April 21, 1904, c. 1402, 33 Stat. 204), Congress further provided that:

"All the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed."

The Creek Nation, being one of the Five Civilized Tribes, comes within the provisions of the act just quoted.

Out of his said allotment, the complainant, Moore, selected as his homestead the southwest quarter of the northeast quarter of section 8, township 17 N., range 12 E., in the Indian Territory, for which patent was executed to him by the Creek Nation, through its principal chief, on May 14, 1906, and approved by the Secretary of the Interior on June 8th of the same year. On the same dates, respectively, there was likewise executed and approved a patent conveying to him, as his surplus allotment, the remainder of the 160 acres previously selected, to wit, the west half of the northwest quarter and the southeast quarter of the northwest quarter of said section 8, containing 120 acres.

On April 12, 1906, complainant executed to Royal S. Litchfield, one of the defendants herein, an oil and gas mining lease covering the homestead, and that portion of his surplus allotment described as the west half of the northwest quarter of said section 8 (which we shall designate as the west 80), in all 120 acres. This lease was executed on the form provided for use at that time pursuant to rules and regulations promulgated by the Secretary of the Interior, covering leases of Creek Indian lands, and extended for a period of 15 years; and, in consideration of the royalties and other stipulations contained, purported to demise, grant, and let to the said Litchfield, for the said term, all of the oil deposits and natural gas in or under said land, with the right to prospect therefor, and other rights usually incident to such leases. At the time of the execution of this lease, the regulations prescribed by the Secretary of the Interior provided that oil and gas leases requiring his approval, together with certain accompanying papers, should be filed with the United States Indian agent at Muskogee, and by him transmitted through the proper channels for the Secretary's approval. This lease appears to have been filed with the Indian agent on April 16, 1906, and was finally approved by Jesse E. Wilson, Assistant Secretary of the Interior, on January 9, 1907. It appears from the evidence that immediately upon the approval of said lease said Litchfield began to sink wells on the portion of the land comprising the homestead, and before the filing of this suit had expended a large sum of money upon said land, and had brought in a number of producing wells thereon. After the approval of said lease, the lessee paid to the lessor, Moore, the complainant, the sum of $120, the bonus agreed upon, and has from time to time paid the stipulated royalties.

On June 1, 1906, the complainant, Moore, executed to the United States Loan & Trust Company an instrument styled a "lease," covering the 120 acres above described, wherein it is provided:

"That in consideration of the sum of fifty dollars, in cash, lawful money of the United States, this day in hand paid by said party of the second part to the said party of the first part, the receipt of which is hereby acknowledged, the said Zeka Moore (single) party of the first part hereby grants

unto said party of the second part, all the oil, gas, coal and asphaltum in and under the following described premises, together with the right to enter thereon at all times for the purpose of prospecting, operating, mining or drilling for oil, gas, coal and asphaltum, and to erect and maintain all buildings and structures, and lay all pipes or other means of transportation necessary for production and transportation of all oil, gas, coal or asphaltum, taken from said premises. Excepting and reserving, however, to the first party the one-tenth part of all oil produced or saved from said premises, to be delivered in the pipe lines to which said second party may connect all wells, namely:

"All that certain tract of land lying and being within the Creek Nation, and within the Indian Territory, to-wit: The west half of the north west quarter and the south west quarter of the north east quarter of section eight (8), township seventeen (17) north, range twelve (12) east. Containing 120 acres, more or less.

"To have and to hold the above premises for and during the term of fifteen years from this date and as much longer as oil, gas, coal, or asphaltum is found or produced thereon or the rental paid according to the terms of this lease, on the following conditions: * * * * "

On the date of its execution, this instrument was acknowledged by the said Moore before W. H. Bond, United States Commissioner for the District of Kansas. On November 19, 1906, the said loan and trust company assigned to Usher Carson all its interest under said lease. On November 20th, the said Carson assigned seven-eighths of the interest in said lease claimed by him to J. R. Sharp, one of the defendants herein; and on January 12, 1907, assigned his remaining one-eighth interest therein to J. W. Sloan, one of the defendants herein.

On July 26, 1906, the complainant, Moore, executed to the defendant Sawyer a general warranty deed to the west 80, in consideration of the sum of $1,150. On the same date this deed was acknowledged at the United States penitentiary at Fort Leavenworth, Kan., before W. H. Bond, the United States Commissioner for the District of Kansas, and was recorded in the recording district wherein the land was situated in said Indian Territory, on August 1, 1906. On December 17, 1906, as appears from a certificate appended to said deed, said instrument was again acknowledged by said Moore, before W. H. Bond, a notary public within and for Leavenworth county, state of Kansas. Again, on January 28, 1907, the said Moore appeared before George F. Sharritt, clerk of the United States Circuit Court for the district of Kansas, and acknowledged the execution of said deed. On January 29, 1907, said deed was again recorded in the recording district in said Indian Territory wherein the land was situated.

On July 30, 1906, the defendant Fred L. Sawyer and his wife, Cora M. Sawyer, conveyed by warranty deed to defendant Royal S. Litchfield their undivided one-half interest in the land described in the last-mentioned deed, which was duly acknowledged, and on August 20, 1906, duly recorded in the proper recording district in the Indian Territory. On August 25, 1906, the defendant Litchfield and his wife, Mary H. Litchfield, reconveyed said undivided one-half interest in said land to the defendant Sawyer by warranty deed, duly acknowledged, and on March 22, 1907, recorded in the proper recording district in the Indian Territory.

On December 14, 1906, at the solicitation of W. F. Moffatt, Moore, the complainant herein, signed an instrument styled a "quitclaim deed,"

purporting to convey to one G. R. McCullough all of his right, title, interest, claim, and demand in and to the said west 80.

Thereafter, on December 28, 1906, said McCullough and his wife executed to the defendant O. M. Lancaster an instrument purporting to be a general warranty deed, conveying to said Lancaster the land described in the so-called "quitclaim deed," above referred to. This instrument was duly acknowledged, and on December 29, 1906, recorded in the recording district in Indian Territory wherein the land was situated.

As heretofore stated, at the time of the execution by said Moore of all the instruments referred to, he was a prisoner in the penitentiary, and all the transactions were had with him at the penitentiary. He had never seen the land himself, and was not at liberty to go and examine it, to ascertain its probable value, had he desired to do so. Shortly after acquiring the interest of Carson in the loan and trust company lease, the defendants Sharp & Sloan proceeded to erect a rig and drill for oil on the west 80. Thereupon, in January, 1907, defendant Sawyer instituted suit against them in the United States Court for the Indian Territory at Sapulpa, to enjoin them from interfering with his possession of said land under his warranty deed from Moore. Subsequently, by amendment filed February 4, 1907, other parties claiming interest in the land were made parties defendant, so that it became a suit by Sawyer against J. R. Sharp, J. W. Sloan, J. Usher Carson, Zeke Moore, the United States Loan & Trust Company, G. R. McCullough, O. M. Lancaster, and Royal S. Litchfield, the object of which was to establish Sawyer's title to the land and set aside and annul the instruments under which the various defendants were claiming interest adverse to his, and remove such clouds from his title. Subsequently, on April 22, 1907, Moore, the complainant, commenced his action against the defendants herein and certain others, as to whom the action has since been dismissed, to recover possession of the land, to enjoin defendants from interfering with his possession, for the appointment of a receiver pendente lite, and an accounting for oil extracted from the land. The basis for this suit as originally filed was the alleged fraud and misrepresentation practiced upon him by the defendants in the procurement of the various deeds and leases referred to. By an amendment filed later, by leave of court, he also alleged that at the time of the procurement of the Litchfield lease, the loan and trust company lease, and the Sawyer deed, he was a minor, and that he had not ratified said contracts since becoming of age, and expressly repudiated the same. Subsequently these two suits were consolidated in the present action. Amended complaint has been filed by complainant, and the various defendants have responded by answers and cross-bills.

We will first consider the question of minority, as involved in this case. The burden is upon the plaintiff to establish that, at the time of entering into said contracts, he was in fact a minor.

"The presumption of infancy is never indulged. The one who sets up infancy, either as a ground of affirmative relief or by way of defense, has the burden of proving it." Enc. of Evidence, vol. 7, p. 262.

"When nothing appears to the contrary, persons entering into an agreement

are presumed to be adults and competent to contract, and hence one who relies upon his infancy to defeat his act, contract, etc., has the burden of proving such infancy." 22 Cyc. 690.

"Where a party sets up infancy, and it appears at the time of the transaction sought to be avoided that he was near the age of majority, the burden is upon him to clearly show his infancy at the time of the transaction." Davis v. Coan, 14 La. 257.

I have carefully reviewed the volume of testimony offered on the question of minority, and have thoroughly considered the same, and I find that the complainant has failed to establish by a preponderance of the evidence the fact that he was a minor as alleged in his complaint. As I view the record, he has failed to discharge the burden which the law places upon him of overcoming the presumption of majority under which he labors. The testimony as to his age is largely circumstantial and very conflicting. While a negro, it appears that he has had sufficient educational advantages to enable him to read and write readily; his conduct and demeanor upon the stand impressed me as that of a person of more than the ordinary intelligence of one of his race. At various times recited in the record he made statements regarding his age, which, if true, establish his majority at the times in controversy beyond question. In arriving at this conclusion, I have not considered the testimony offered involving records of the Pension Department or records of the Dawes Commission, based upon statements appearing to have been made by others than the complainant himself.

Were the various deeds and leases secured from complainant by such misrepresentation or fraud as entitles him to the relief sought or any relief in the premises?

First in point of time is the lease to Litchfield. This, as has been stated, was taken upon a departmental form prescribed by the Secretary of the Interior, evidently upon the theory that the approval of the Secretary was necessary to its ultimate validity. It covered the homestead, consisting of 40 acres, as well as 80 acres of the surplus allotment. Clearly, as to that portion comprising the homestead the approval of the Secretary was essential. In contradistinction to departmental leases, requiring the approval of the Secretary, there is another class of leases, commonly known as "commercial leases." These are leases taken without the Secretary's approval from allottees from whose lands the restrictions upon alienation have been removed. We shall hereafter consider the question of the validity of a commercial lease as to lands, other than homesteads, of adult citizens not of Indian blood. But, however that may be, the Secretary's approval as to that portion outside of the homestead, even if unnecessary, would not in any way militate against the validity of the lease. This lease was procured through the agency of one J. B. Tomlinson, acting for Litchfield. It appears that in the spring of 1906, about the time this lease was procured, a number of oil wells were brought in on that portion of the field about two miles east of the land in controversy, which proved to be large producers, and, while no development was at that time made in the immediate vicinity of the land in controversy, its proximity to the proven field made it a desirable

venture for oil producers. Thereupon the said Tomlinson called upon the complainant at the penitentiary for the porpose of securing an oil lease from him for his client, Litchfield. After more or less parley, the complainant, some time in March, 1906, executed a lease to Litchfield for a bonus of $120, to be paid when the lease was approved by the Indian agent, and a royalty of 10 per cent. of all oil produced, as well as a stipulated sum per acre as advance royalty pending the development of the property. The first lease having been drawn upon improper forms, a second lease was prepared on the approved departmental forms for the Creek Nation, and executed in lieu of the first lease, on April 12, 1906. Complainant says that Tomlinson first said he wanted the land for grazing purposes, but that, on the 12th, the day he finally got the lease in controversy, he said no doubt some mineral or something might be found. Tomlinson testifies that he told complainant he knew nothing about the land, had never seen it, or been in the neighborhood of it, but that Mr. Litchfield told him he was informed it was rough and not worth much for agricultural purposes; that complainant said he knew the land, and had filed upon it because he thought there would be oil under it; that finally complainant agreed to give the lease, if, after conferring with one Bradley, in whom he appeared to have confidence, it appeared to be advisable to do so; that Bradley came, and, after a conference with him, the lease was executed. Witness Smith, a guard at the penitentiary, testifies that about April 1, 1906, he was present when Tomlinson and complainant had a conversation regarding the lease, in which Tomlinson said he wanted to lease the land for grazing purposes, and that it was good for that purpose only, and that, in response to complainant's question, he said there was no oil or mineral on the land; that no lease was consummated at this time, but that, after complainant had been sent back to his work, Tomlinson told witness it was a very valuable piece of land, but that complainant did not know this, because he had never seen the land. It is clear that on April 12th, when complainant executed the lease in controversy, he knew that it was an oil lease; he could read and write, and he did read the lease over, and, from letters subsequently written, at his instance, to Tomlinson, it is clear that he quite fully understood its terms and the conditions with regard to the payments of bonus, etc. It is not clear, however, that he was fully informed as to the proximity of this land to proven oil territory, and if it appeared from the evidence that the terms of this lease at the time it was taken, as compared with similar leases on other lands in that locality, were unfair and did not secure to complainant a reasonable consideration for the lease, in view of all the conditions then existing, the court, in consideration of the manifest disadvantage under which complainant was placed, would be impelled to set it aside. But it appears that this lease was only one of a number of similar leases made at that time in this locality. It does not appear that the consideration for which this lease was given was less than that of other similar leases about that time, and there is evidence tending to show that such other leases were based upon a consideration not greatly differing from this one. Then there is this further consideration: The

law had provided that certain of these leases should not be valid unless approved by the Secretary of the Interior. At least a portion of the land included in the lease was of the character which could only be leased with the Secretary's approval. After passing through the usual channels, this lease was approved by the Assistant Secretary, which, for the purposes of this case, may be considered as of the same force as the approval of the Secretary himself. It must be presumed that this approval was not made until after a careful and impartial examination of the matter had convinced the Secretary that the consideration and terms of the lease were fair. It is in evidence that Mr. Mossman and Mr. Creager, connected with the Indian agent's office, personally visited the land and examined it for the purpose of making a report to the Secretary thereon; that the report was made, and that thereupon the lease was approved. Of course, in April 1906, it was not known whether oil would be discovered under this land or not, although its proximity to oil territory made it a desirable venture. As said in Pickering v. Lomax, 145 U. S. 316, 12 Sup. Ct. 860, 36 L. Ed. 716:

"The object of the proviso was not to prevent the alienation of lands in toto, but to protect the Indian against the improvident disposition of his property, and it will be presumed that the President, before affixing his approval, satisfied himself that no fraud or imposition had been practiced upon the Indian when the deed was originally obtained."

As it does not appear that at the time this lease was executed its terms were inequitable or the consideration inadequate, in view of the conditions as they then existed, and in view of its approval by the Secretary of the Interior, I find that complainant's prayer that it be canceled and set aside should be denied.

Next in point of time is the lease to the United States Loan & Trust Company, which, by the various mesne assignments heretofore recited, finally passed to the defendants Sharp & Sloan. This lease, in addition to covering the west 80, also covers the 40 acres comprising the homestead, and as to the latter tract, never having been approved by the Secretary of the Interior, is invalid, and, so far as the homestead is concerned, should be canceled. But as to the 80 acres not homestead, the question is first presented whether as to that also the approval of the Secretary was necessary, or whether, since the passage of the act of Congress of April 21, 1904, above recited, removing all restrictions upon the alienation as to adult allottees not of Indian blood, except as to homesteads, such allottees may lease their surplus lands without the Secretary's approval. The contention of counsel for Sharp & Sloan that this was a conveyance in fee of the oil in place, and therefore an alienation, has not been overlooked. It is true that in the case of Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213, involving a Kansas contract, the Circuit Court of Appeals for this circuit say that the instrument styled a "lease" that is under consideration is more in the nature of a grant in præsenti of all the oil and gas in the lands described, following decisions of the Supreme Court of that state, but also add that, because of the designation given to the instrument by the parties, it will be treated as a lease. The instrument here

considered is termed a "lease," has a definite term of 15 years, and provides for an annual royalty or rental. The concluding paragraph in the instrument is as follows:

"It is further expressly agreed between all the parties hereto that the party of the second part shall have the right to hold said lease for the term above mentioned if said rental is promptly paid when due; and the said sum of fifty dollars, this day received by the said party of the first part from the said party of the second part, is the consideration for the right of the party of the second part to pay said rental and hold said lease during said term or until said development or developments as above provided are completed."

Applying to this instrument the ordinary rules of construction, and considering all its parts with a view to harmonizing them and arriving at the real intention of the parties, it is, in my opinion, simply a lease, the $50 mentioned being a bonus paid or agreed to be paid to induce its execution.

Counsel have presented very elaborate and ingenuous briefs upon the proposition that the act of April 21, 1904, removing restrictions upon alienation, did not affect the matter of leasing, on the theory that leasing is not in any sense an alienation. The question is, What did Congress intend? and if that intent can be determined from a consideration of the legislation itself and the circumstances under which it arose, then we need not consume the time and labor incident to examining decisions of other states, where, under different circumstances, the technical terms involved have been variously construed. By section 16 of the supplemental agreement, above quoted, Congress restricted the alienation of lands for certain periods. Note the language:

"Lands allotted to citizens shall not * * * be encumbered, taken, or sold to secure or satisfy any debt or obligation, nor be alienated by the allottee or his heirs, * * *" etc.

This is the only section of the act placing restrictions upon the disposition of their lands by allottees. Then follows section 17, providing that citizens may rent their allotments under certain terms and conditions. This express permission to rent clearly implies that but for such permission the right to rent or lease would not exist. But why would it otherwise not exist? Clearly, only because of the sweeping restriction upon alienation contained in the preceding section. By the act of April 21, 1904, this restriction as to adult allottees not of Indian blood was removed except as to homesteads. It follows that if the restrictions imposed by section 16 comprehended renting or leasing, making the permissive clause of section 17 necessary, then the repeal of section 16 by the act of April 21, 1904, gave those affected by the act the same right to lease as to otherwise alienate. Such, in my opinion, is a fair and reasonable construction of the legislation. In my opinion, freedom to rent or lease their allotments without restriction was extended to all allottees of the Five Civilized Tribes affected by the act of April 21, 1904, to the same extent as said act removed from them the restrictions upon disposition otherwise. Such is the interpretation now placed upon this act by the Secretary of the Interior, and this de-

partmental construction, while not controlling, is entitled to great weight. Brown v. U. S., 113 U. S. 568, 5 Sup. Ct. 648, 28 L. Ed. 1079; Farrell v. U. S., 110 Fed. 942, 49 C. C. A. 183. The act approved May 27, 1908 (Act May 27, 1908, c. 199, 35 Stat. 312), entitled "An act for the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes and for other purposes," is the last expression of Congress on the subject of alienation and leasing, and a careful study of that act confirms the conclusion that Congress in its use of the term "alienation" intended it to include the leasing of lands, treating a lease as a species of alienation. This is the construction given this act by the Supreme Court of this state, as recently decided in the case of Eldred v. Okmulgee Loan & Trust Co. (not yet officially reported) 98 Pac. 929, and is, I think, in accord with the history and spirit of all congressional legislation looking to the allotment of these lands in severalty and the dissolution of these tribal governments. It follows that the approval of the Secretary of the Interior was not essential as to the validity of the lease of the complainant, Moore, to the United States Loan & Trust Company, except as to that portion of the land comprising the homestead.

But has complainant established his contention that this lease should be canceled? In addition to his claim of minority, which, as we have seen, is not established, he alleges in his complaint that the consideration of $50, claimed in the lease, was never paid, and that such sum was grossly inadequate and unconscionable; that he was informed by the agent who secured the lease that there was no oil in that part of the territory; that this agent was the agent not only of the lessee, but of Usher Carson, Sharp & Sloan, and subsequent assignees of said lease; that each of them knew of the fraud that was perpetrated upon him, and knew that the lease was obtained for a grossly inadequate consideration, and by false and fraudulent representations as to the value of the land and as to the fact of its containing oil, and that the lease was of the reasonable value of 10 per cent. royalty and a bonus of $100,000. The evidence fails to show any collusion between Sharp & Sloan or Carson and the loan and trust company, the original lessee. Nor does the evidence show that, at the time the lease was made, the consideration named therein was so inadequate as, in my judgment, to warrant a court in canceling this instrument. It does not appear that the royalty of one-tenth, or 10 per cent., of the oil, provided for in the lease, was less than the usual royalty. Nor does the evidence show that the bonus of $50 was at the date of the lease grossly inadequate. The evidence fails to establish that in the procurement of the lease any person representing the loan and trust company made any representations regarding the absence of oil in that part of the territory, and the further fact that an oil lease was being taken would naturally have caused such a representation to have been received with suspicion. Heckman, the agent of the lessee, who procured the lease, testifies that the consideration of $50, recited in the instrument, was paid by crediting lessor for borrowed money. This is denied by the lessor. But he executed the instrument, so far as the evidence

shows, voluntarily, and it recites the payment of the $50. Neither Carson nor Sloan had any intimation that it was not paid. I fail to find that the consideration of this lease was grossly inadequate, or that any fraud was practiced upon complainant in its procurement. But even if there had been such fraud practiced by the agent of the loan and trust company in the procurement of this lease as would have warranted the court in canceling it in the hands of the original lessee, still, as it does not appear that Sharp & Sloan, the assignees of said lease, had any notice whatever of such fraud or misrepresentation, or that the consideration was not paid, they hold the lease as innocent purchasers of the interest thereby conveyed, so far as any equities urged by the complainant are concerned. 23 Am. & Eng. Encl. Law (2d Ed.) p. 477, and cases cited in note. It follows that, as between the complainant and Sharp & Sloan, this lease is valid as to the west 80, but is invalid as to the homestead.

Next in point of time is the warranty deed from complainant to defendant Sawyer. This deed was procured on July 28, 1906. It appears from the evidence that, shortly after the Litchfield lease of April 12th was secured, the St. Louis Oil Company procured a lease on some land south of and cornering with the land covered by this deed. Defendant Sawyer was a copartner in this company. As the St. Louis Company was going to drill upon its property, Sawyer conceived the idea of buying from Moore, the complainant, the land covered by this deed. He testifies it was then about a mile and a half away from production; he thought it would be a good speculation if oil should be struck on the St. Louis Company's property; his partner, Litchfield, then had the lease on the property. At this time I. N. Ury was representing the complainant in an effort to secure a pardon for him, and was in constant communication with complainant regarding the matter. Sawyer testifies that Ury also represented him in the purchase of most of the land he was then buying in the Indian Territory. On July 28, 1906, Sawyer, together with his attorney, Tomlinson, and Ury went to the penitentiary to see the complainant relative to the purchase of his land. After a conference, lasting nearly all day, and in which, upon the one side, Ury, Tomlinson, and Sawyer were trying to procure the deed for a sum not exceeding $800, and gradually raising the offer, and Moore was refusing to sell, the deed was finally procured for a consideration of $1,150 which was then paid. It was represented to the complainant at the time by Ury that $800 was a fair valuation for the land. Ury had seen the land, and admits that oil had been developed in that locality, and that there was more or less oil excitement; but this was not communicated to complainant. Complainant was not informed by Sawyer that he was interested in the adjoining property and expected to prospect the same. He was not informed that oil was being produced within a mile and a half of the property. Sawyer, or those acting for him, represented that the value of the land was not to exceed $10 per acre. The evidence also strongly tends to prove that it was at the time represented to Moore that it was not thought there was any oil there, and that the

land was good only for grazing purposes. Complainant testifies that, had he known the true conditions existing at the time, he would not have made this deed. Did defendant 'Sawyer's failure to advise complainant of the proximity of oil production, and his purpose of sinking wells upon the adjoining property, and the representation as to the value of the 'land and as to what it was useful for, amount to such fraudulent concealment of the truth and misrepresentation of fact as in equity entitled the complainant to a cancellation of his deed? Fraud, in equity, includes all willful or intentional acts, omissions, and concealments which involve a breach of either legal or equitable duty, trust, or confidence, and are injurious to another, or by which an undue or unconscientious advantage over another is obtained. In Loewer v. Harris, 57 Fed. 373, 6 C. C. A. 398, the court said:

"It is an elementary proposition in the law of fraud that, if one party to a contract knowingly assists in inducing the other to enter into it by leading him to believe that which he himself knows to be false, his conduct is fraudulent, and it matters not whether the result is brought about by misrepresentation or by keeping silent when duty requires a disclosure. As was said in French v. Vining, 102 Mass. 135, 3 Am. Rep. 440: 'Deceit may sometimes take a negative form, and there may be circumstances in which silence would have all the legal characteristics of actual misrepresentation.'"

"Where the party intentionally or by design misrepresents a material fact, or produces a false impression in order to mislead another or to entrap or cheat him, or to obtain an undue advantage of him, in either such case, there is a positive fraud in the truest sense of the term; there is an evil act with evil intent." Smith v. Richards, 13 Pet. 36, 10 L. Ed. 42.

"Conveyances from weak men, for small considerations, much below ·the value, in necessitous circumstances, and especially if obtained from men not fully cognizant of their rights, * * * will be set aside." Bunch v. Hurst, 3 Desaus. (S. C.) 273. 5 Am. Dec. 551.

"If either party to a transaction conceals some fact which is material, which is within his own knowledge and which it is his duty to disclose, he is guilty of actual fraud." 2 Pomeroy's Eq. Juris. § 901.

After 'stating that it is not every concealment or failure to disclose material fact that amount to fraud, Mr. Pomeroy, in the section just quoted, says:

"While the decisions admit these propositions. they are agreed, on the other hand, that it is only silence which is permitted: If, in addition to the party's silence, there is any statement, even any word or act, on his part, which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's .attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent."

In 20 Cyc., at page 65, it is said:

"Although a prospective purchaser has special knowledge of facts which enhance the value of the property, and the vendor is ignorant of these facts, the purchaser is, ordinarily, under no duty to disclose them to the vendor, and is not liable in an action of deceit for failure to do so. But if, in such a case, he volunteers to convey information which may influence the vendor's conduct in making the sale, he is bound to tell the whole truth, and a fraudulent misrepresentation of a material fact will render him liable. Indeed, it has been held that there is no difference in legal effect between fraudulent misrepresentation by a vendor and by a purchaser. Thus, where the vendor is ignorant of the facts, the purchaser's fraudulent misrepresentations as to the quantity of land in the tract, or as to extrinsic facts, materially

affecting the value of the property, or his false assertions as to its value and condition, where the property is distant from the place of contract, are actionable. Where the parties deal on equal footing, and the facts in question are equally open to the knowledge of the vendor, the general principles requiring reasonable investigation or inquiry are applicable. But where any relation of trust or confidence exists between the parties, so that the vendor is induced to rely in the honesty and superior knowledge of the purchaser, or where the purchaser has special knowledge of the facts while the vendor is ignorant thereof, and the purchaser's representations are positive assertions made as of his own knowledge, the vendor is justified in relying on the statements, and cannot be deemed negligent in not making further investigation."

In the case of Wheeler v. Smith et al., 9 How. 55, 13 L. Ed. 44, the complainant, Wheeler, sought to have set aside an agreement he had made with the executors of his deceased uncle, Chas. Bennett, by which he had relinquished certain rights in his uncle's estate and refrained from contesting the will. He had been induced by the executors to execute the agreement. One of them, a lawyer, stated to complainant that in his opinion the will was valid, but the compromise was made to avoid litigation. The Supreme Court say:

"The complainant, it seems, had studied law, but it is manifest from the facts before us that he was but little acquainted with business, was an inefficient and dependent man, easily misled, especially by those for whose abilities and characters he entertained a profound respect. From the high character of the executors, no one can impute to them any fraudulent intent in this transaction. Looking to what they considered to be the object of the testator, they felt themselves authorized, if not bound, to effectuate his purposes by making this compromise with his heir at law. They had no personal interest beyond that which was common to the citizens of Alexandria. And we admit that they may have acted under a sense of duty, from a misconception of their power under the will.

"But in making the compromise, the parties did not stand on equal ground. The necessities and character of the complainant were well known to the executors. Having the confidence expressed in the validity of the devise, they could hardly have felt themselves authorized to pay to the complainant twenty-five thousand dollars for the relinquishment of a pretended right. Nor could they have deemed it necessary, in the agreement of compromise, substantially to constitute him the donor of the munificent bequest to the town and trade of Alexandria.

"We are to judge of this compromise by what is stated in the bill, the facts being admitted by the demurrer. And it appears to us that the agreement, under the circumstances, is void. It cannot be sustained on principles which lie at the foundation of a valid contract. The influences operating upon the mind of the complainant induced him to sacrifice his interests. He did not act freely, and with a proper understanding of his rights."

In this case, the complainant was confined in the penitentiary in another state; he never had seen the land, and there is no evidence that he had any definite knowledge of the conditions surrounding the land relating to its value on July 28, 1906, when the deed was procured, except as he was informed by Sawyer, Tomlinson, and Ury. The parties were not on equal footing, and the disadvantage under which the complainant labored by reason of his confinement in the penitentiary, and consequent inability to visit the land, is a circumstance which, of itself, requires that a court of equity scrutinize the transaction the more closely. Mr. Ury, whom Sawyer procured to go from Muskogee to assist him in securing the deed, is the man who, at the time, was representing complainant in

seeking a pardon, and in whom, therefore, the complainant evidently reposed special confidence. Mr. Ury's success in procuring the pardon was dependent upon complainant's providing money to pay his lawyers, and he could only procure it by disposing of his land, or a portion. of it. I am convinced from the evidence that Sawyer had Ury accompany him to Leavenworth because of Ury's relations with the complainant, and his consequent usefulness in influencing complainant to sell his property; and, while complainant did not at first accept the price suggested by Ury as reasonable, it may be fairly inferred from the testimony that the complainant's need of money to secure his pardon, and the urgent solicitation of Ury that he make the sale, were largely influential in inducing him to do so. Complainant was in distress and urgently in need of money, which in the very nature of things must have been known to Sawyer. He secured Ury as his agent or intermediary to accomplish the purchase, who at the time occupied a confidential relation with the complainant. These conditions gave him a decided advantage over complainant, and it became correspondingly incumbent on him that he treat complainant with the utmost good faith.

While I do not find in the record any direct testimony as to the market value of the land on July 28, 1906, the date the deed was secured, still, considering the fact that it was within a mile and a half of producing property, that the adjoining property was considered of sufficient promise to warrant the company in which Sawyer was interested to go to the expense of sinking wells thereon, that it was then within the territory covered by the oil excitement, and that the deed which complainant was being urged to give deprived him of any participation in advances in the price of the land incident to development, and from future royalties, and from a consideration of all the evidence in the case, I am forced to the conclusion that neither $8 nor $10 per acre, nor the price which defendant Sawyer paid, which was something over $14 per acre, was, under all the existing circumstances, a fair and adequate consideration for the land at the time. In section 928 of Equity Jurisprudence, Mr. Pomeroy says:

"If there is nothing but mere inadequacy of price, the case must be extreme in order to call for the interposition of equity. Where the inadequacy does not thus stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted. But even here the courts have established clearly marked limitations upon the exercise of their remedial functions, which should be carefully observed. The fact that a conveyance or other transaction was made without professional advice or consultation with friends, and was improvident, even coupled with an inadequacy of price, is not of itself a sufficient ground for relief, provided the parties were both able to judge and act independently, and did act upon equal terms, and fully understood the nature of the transaction, and there was no undue influence or circumstance of oppression. When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative."

In view of this inadequacy of consideration, coupled with the representations made as to the value of the land and the uses of which it was capable, and Sawyer's silence as to the real conditions surrounding the land, and in view of all the attendent circumstances and relative position of the parties at the time, it is my opinion that the prayer of complainant that said deed be canceled and held for naught should be granted. The decree will further provide that complainant, Moore, repay to the defendant Sawyer the sum of $1,150, the consideration originally paid, together with interest thereon at the legal rate, from the date it was paid, which amount shall be made a lien upon the land described in said deed until fully paid.

We now come to a consideration of the quitclaim deed from the complainant to G. R. McCullough and the warranty deed from McCullough to O. M. Lancaster. I find from the evidence that the quitclaim deed referred to was secured from complainant by Moffatt, who, at the instance of McCullough, visited complainant in the penitentiary for that purpose. Upon Moffatt's first visit to complainant, he attempted to secure a warranty deed from him; complainant refused to execute a warranty deed for the reason, as stated by him, at the time, that he had already deeded the property and had nothing to deed. Moffatt then left him, but returned the next day with a quitclaim deed. This he presented to complainant, representing that it was only a paper showing that complainant had no interest in the property. Moffatt told complainant he desired such a paper for use in some litigation instituted or to be instituted regarding the land. Complainant relied upon this statement and executed the quitclaim deed without knowledge that it was in fact a deed, but believing that it was merely a statement such as Moffatt had represented it to be, and received from Moffatt the sum of $120, which amount is recited in the instrument as the consideration.

I find from the evidence that at the time of the execution of this deed the land it purports to convey was worth not less than $25,000. Within a few days after the execution of the quitclaim deed, McCullough offered the land to Lancaster for the sum of $1,200, agreeing to make him a warranty deed therefor. Lancaster accepted the offer, and a few days later paid McCullough the sum of $1,200 and secured from him a warranty deed. He made no examination whatever as to the title, relying solely upon McCullough's statement and the warranty deed. Lancaster at the time was interested in several properties in the Glenn Pool field, and knew of two producing wells then in existence, one with capacity of about 200 barrels and the other with capacity of about 1,200 barrels per day, both within a radius of 1½ or 2 miles from this property. In view of this state of affairs, is complainant entitled to a cancellation of the deeds to McCullough and Lancaster?

In section 918 of volume 2, Pomeroy's Equity Jurisprudence, the author says:

"The remedy which equity gives to the defrauded person is most extensive. It reaches all those who were actually concerned in the fraud, all who directly and knowingly participated in its fruits, and all those who derive title from them voluntarily or with notice. 'A court of equity will wrest property fraudulently acquired, not only from the perpetrator of the fraud,

but, to use Lord Cottenham's language, from his children and his children's children, or, as elsewhere said, from any persons amongst whom he may have parceled out the fruits of his fraud.' There is one limitation: If the property which was acquired by the fraud has come by transfer into the hands of a bona fide purchaser · for a valuable consideration and without notice, even though his immediate grantor or assignor was the fraudulent party himself, the hands of the court are stayed, and the remedy of the defrauded party, with respect to the property itself, is gone; his only relief must be personal against those who committed the fraud. To this limitation there is, however, an exception, where the general rule giving relief applies even as against a bona fide purchaser. Where an owner has been apparently deprived of his title by a fraudulent conveyance or assignment which is void, as where he was procured to execute it by the fraudulent representation and under the conviction that it was entirely a different instrument, or where it was fraudulently executed in his name without any authority, express or implied, or where, after being executed by him for one purpose, it was fraudulently altered without his knowledge or authority, so as to include the property, or where it was a forgery, and he has done no collateral act with reference to it which might amount to an equitable estoppel by conduct, and the property, by means of such transfer, comes into the hands of a purchaser for value and without notice, the original defrauded owner is not barred of his remedy. Equity will relieve by canceling the fraudulent apparent transfer, and by compelling a reconveyance or reassignment, even as against the holder who is innocent of wrong. The doctrines of equitable estoppel and of bona fide purchase do not apply under these circumstances. Such is the doctrine announced by decisions of the highest authority."

In the light of this well-recognized authority applied to the foregoing facts, I am clearly of the opinion that these instruments should be canceled, even though it were made to appear that Lancaster was a bona fide purchaser for a valuable consideration, without notice. The evidence, to my mind, clearly establishes that the complainant was induced to execute the quitclaim deed by misrepresentation on the part of Moffatt amounting to fraud, and under the conviction that it was an entirely different instrument from what it purports to be upon its face; that he did not intend thereby to convey any interest in the land, and, under the circumstances of this case, did not do so. This is borne out by the complainant's testimony and that of witness Fisher, clerk at the prison and a disinterested party. Moffatt was acting for McCullough, and whatever he did in the procurement of the deed affects it as though done by McCullough himself. Stackpole v. Hancock, 40 Fla. 362, 24 South. 914, 45 L. R. A. 814.

But can the defendant Lancaster be said to be a bona fide purchaser for a valuable consideration, without notice? As a man of ordinary intelligence, in view of the familiarity he is shown to have had with the properties in the Glenn Pool and their values, the very fact that the fee-simple title to this 80 acres could be secured for even $1,200 was sufficient to arrest his attention. Even the slightest examination into the title, along the line which would most naturally suggest itself to him, would have at once disclosed to him the quitclaim deed upon which his grantor relied, wherein would have been recited the absurd and grossly inadequate consideration of $120, a sum so small as to shock the conscience of any man having his knowledge of the existing conditions. In Simmons Creek Coal Co. v. Doran, 142 U. S. 437, 12 Sup. Ct. 246, 35 L. Ed. 1063, the Supreme Court quote approvingly from the Virginia Court of Appeals as follows:

"Purchasers are bound to use a due degree of caution in making their purchases, or they will not be entitled to protection. Caveat emptor is one of the best settled maxims of the law, and applies exclusively to a purchaser. He must take care and make due inquiries. He is bound not only by actual, but also by constructive, notice, which is the same in its effect as actual notice. He must look to the title papers under which he buys, and is charged with notice of all the facts appearing upon their face, or to the knowledge of which anything there appearing will conduct him. He has no right to shut his eyes or his ears to the inlet of information, and then say he is a bona fide purchaser without notice."

In view, then of these things of which he was bound to take notice, in what attitude does the law place defendant Lancaster under the circumstances of this case  The rule is well stated in 23 Am. & Eng. Encl. of Law (2d Ed.) p. 495, as follows:

"It is a well-settled rule that where a purchaser has knowledge or information of facts which are sufficient to put an ordinarily prudent man upon inquiry, and the inquiry, if followed with reasonable diligence, would lead to the discovery of defects in the title or of equitable rights of others affecting the property in question, the purchaser will be held chargeable with knowledge thereof, and will not be heard to say that he did not actually know of them. In other words, knowledge of facts sufficient to excite inquiry is constructive notice of all that the inquiry would have disclosed."

He is offered property worth $25,000 for the sum of $1,200. His grantor's title is evidenced by what the parties to the instrument were pleased to term a quitclaim deed, reciting a consideration of $120. A derrick for the sinking of a well is already erected upon the property or nearing completion; within a mile and a half or two miles are several producing wells, one with a capacity of 1,200 barrels per day. No one, in my judgment, who will impartially consider the evidence can escape the conclusion that if, as Mr. Lancaster claims, he was ignorant of all these things, it was because he shut his eyes and his ears to information which, had he exercised the diligence of a man of ordinary prudence, would have been imparted to him, and which information would have conducted him to a full knowledge of the complainant's equities in this case. If so, then he is charged with such knowledge, and cannot be heard to say that he is a bona fide purchaser without notice. The manifest inadequacy of consideration, both in the deed from Moore to McCullough and that executed by McCullough to him, was sufficient to put Lancaster upon inquiry.

"To constitute good faith, there must be absence, not alone of participation in the fraud, or collusion with the vendee, but also of the knowledge or even notice of the fraud, or of facts and circumstances calculated to put an ordinarily prudent business man on inquiry, so that he would ascertain the truth." Wafer v. Harvey County Bank, 46 Kan. 597, 26 Pac. 1032.

In the case of Smith v. Phillips, 9 Okl. 304, 60 Pac. 119, in discussing the question of the inadequacy of the consideration involved in that case, the Supreme Court of Oklahoma say:

"Phillips thereafter took a deed from Evans therefor, the consideration of which is stated to be two hundred and fifty dollars; * * * the deed from Evans to Phillips including not only the south portion of lot 3, for which the evidence shows that H. E. Smith had paid a thousand dollars, but also the whole of lot 1, for only a part (less than half) of which Johanna Smith had in the previous year paid to Evans three hundred and fifty dollars. The gross disparity which the face of the deed shows that Evans offered and

sold a portion of his property for to Phillips is sufficient to upset any theory that Phillips was a bona fide purchaser."

Mr. Pomeroy, in his work on Equity Jurisprudence (volume 2, § 600), says:

"What facts are sufficient to put the party upon an inquiry, so that he may thereby be charged with the actual notice inferred from circumstantial evidence? Among the facts to which as evidence such force has been attributed are: Close relationship, personal intimacy, or business connections existing between the purchaser and the party with whom he is dealing or between him and the holder of the adverse claim; great inadequacy of the price, which might arouse the purchaser's suspicion and put him upon inquiry as to the reasons of selling the property at less than its apparent value; the sight or knowledge of visible matter or objects upon or connected with the subject-matter which might reasonably suggest the existence of some easement or other similar right."

In the case of American Emigrant Company v. County of Wright, 97 U. S. 339, 24 L. Ed. 912, the Supreme Court thus refer to the inadequacy of consideration involved in that case:

"The emigrant company secures about six thousand acres of land of the value of $1.25 per acre and $981 in cash. Over $8,000 for the vague promise of doing $500 worth of public improvements. The very inadequacy of the consideration is enough to throw the strongest suspicion on the fairness of the transaction."

Each case of this character must be determined by its own peculiar circumstances. The complainant in this case was not on an equal footing with persons dealing with him, but labored under such a manifest disadvantage that a court of equity may well scrutinize closely the transactions involved. The mere statement of the circumstances known, or which should have been known, to Lancaster when he purchased this land, forces the conclusion that they were sufficient to have put an ordinarily prudent man 'upon inquiry, and that the inquiry, if followed with reasonable diligence, would have led to a discovery of the defects in the title and the equitable rights of the complainant.

The consideration mentioned in the quitclaim deed upon which his grantor, McCullough, relied, was so grossly inadequate as to furnish satisfactory and decisive evidence of fraud. Pom. Equity Jurisprudence, § 927. Even the $1,200 paid by him was so much less than the evidence shows the value of the property to have been that its inadequacy is at once apparent.

I have not overlooked counsel's contention that the instrument termed a quitclaim deed is in fact more than a quitclaim. But however this may be, regardless of the exact character of the instrument, I find the other circumstances already recited entirely inconsistent with good faith and lack of notice on the part of Lancaster. He cannot, therefore, claim the rights of a bona fide purchaser. The prayer of the complainant, that the quitclaim deed to McCullough and the warranty deed to Lancaster be canceled, is granted, and a decree will be rendered accordingly. The decree will provide, however, that complainant pay said McCullough the sum of $120, received by him at the time of the execution of the instrument purporting to be a quitclaim deed, and interest at the legal

rate from date it was received by him, which amount shall become a lien upon the land described in said instrument until fully paid.

This brings us to a consideration of the relative rights of Litchfield and Sharp & Sloan, under their respective leases. The Litchfield lease is prior, in point of time, to the trust company lease, held by Sharp & Sloan, the former having been executed on April 12. and the latter on June 1, 1906.

It is immaterial that the Litchfield lease was not recorded in the recording district where the land was located prior to the assignment of the trust company lease to Sharp & Sloan, because the evidence is clear that, at the time they secured the trust company lease, Sloan, who, as the evidence shows, was acting for himself and Sharp and others at that time interested, knew that the lease to Litchfield had been executed and lodged with the Indian agent for transmission to the Secretary of the Interior for his approval. Therefore Sharp & Sloan had actual notice of the Litchfield lease. The evidence shows that the officials of the loan and trust company and Carson also knew of this lease. But they contend that advices which they received from the Indian agent's office, relative to the cancellation of Litchfield's lease, were such as to justify them in assuming that Litchfield had abandoned the same, and that it had been canceled. It appears that the firm of Zevely, Givens & Smith, attorneys at Muskogee, represented the firm of Litchfield & Sawyer. It also appears that the correspondence and business generally of the firm, and, to an extent, the individual business of Litchfield, was carried on by Sawyer, who, it appears, was in charge of their office at Independence, Kan. It further appears that Mr. McCaughtry, from the office of Zevely, Givens & Smith, early in November, 1906, came to the Indian agent's office, and requested that the lease be canceled, and on November 14, 1906, the Indian agent transmitted the lease to the Interior Department, advising that the parties desired it canceled, and so recommended.

The lease was never actually canceled, for, on December 3d following, upon advice of Sawyer that the request for cancellation had been in error, the Indian agent wired the department requesting the return of the lease, which was done. The transfer to Sharp was dated November 20th, which was between the date the original lease was forwarded for cancellation and the date of the request that it be returned. Sloan says he was acting upon information from the Indian agent's office. The records in the office show that the lease had been forwarded for cancellation. It appears that, having been lodged with the Indian agent for transmission to the Secretary of the Interior, the practice was not to withdraw the lease, but to forward it to the department for disapproval, as the Indian agent's letter of transmissal indicates. While the letter states that both the lessor and the lessee requested its cancellation, there is no evidence other than the letter itself that Moore, the lessor, ever made such a request. Sawyer testifies that, at the suggestion of Litchfield, he inquired about the lease while in Muskogee, early in December, and, discovering that it had been forwarded for cancellation, advised the

Indian agent that it was an error. It was then the telegram of December 3d was sent to the department, recalling the lease and advising of the error.

Under these circumstances, can Sloan be said to have been a bona fide purchaser, without actual notice? I think not. He knew of the existence of the lease. He made no inquiry of Litchfield, but relied entirely upon the information he secured from the Indian agent's office. The records there show, not that the lease had been canceled, but that it had been forwarded for cancellation. As to whether it would be canceled, depended upon the action of the Secretary. If, as Sawyer testifies, the request for cancellation was in error, then an inquiry directed to Litchfield would immediately have appraised Sloan of this fact. Under all the circumstances, I do not find that he exercised that diligence which the law requires of one put upon notice of a prior conveyance to determine the facts relating thereto. He, therefore, took the interest in the trust company lease conveyed to him subject to the rights of Litchfield. He states in his testimony that he made this deal with Carson after a conference with Sharp, and, in fact, made it for himself and Sharp and others interested, and Sharp is therefore bound by whatever notice or knowledge Sloan had. The remaining one-eighth interest transferred by Carson to Sharp, in January following, was transferred after the error had been corrected in the Indian agent's office, and the Litchfield lease, together with all accompanying papers, forwarded for approval; and it therefore follows that this one-eighth interest was secured at least with no less notice or knowledge of Litchfield's rights than that which attaches to the seven-eighths interest conveyed in November previous. Nor do I consider there is any merit in the contention that the Litchfield lease was a unilateral contract, from which Litchfield or complainant could withdraw at any time, and that the subsequent execution of the lease to the trust company by complainant amounted to a repudiation by him of the former lease. On April 16th, four days after it was executed, Litchfield lodged his lease with the Indian agent for the Secretary's approval. By agreement with complainant he had deposited the bonus agreed upon with the officials of the prison, to be paid when the lease should be approved. Whether the approval of the Secretary as to the land not homestead was necessary or not, the parties had made his approval an element in the contract, and, pending his action in the matter, the mere execution by complainant of the lease to the trust company could not affect his prior contract with Litchfield.

It therefore follows that Sharp & Sloan took the trust company lease with notice of and subject to the prior rights of the Litchfield lease, and while, as between themselves and the complainant Moore, the lease is held to be valid as to the west 80, they cannot exercise any rights under it, so far as oil and gas are concerned, during the term of the Litchfield lease, or until such time as it shall cease to be a valid and subsisting instrument. As to the 40 acres

comprising the homestead, the lease is invalid, and should be canceled so far as it affects that property.

A number of other questions were raised in the course of the trial, and urged by counsel in argument and by briefs, which it is now unnecessary to decide.

Let decree be entered in accordance with this opinion.